**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| ROLLS-ROYCE plc, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 1:10-cv-457-LMB-JFA |
| ) | |
| v. ) | |
| ) | **PUBLIC VERSION** |
| UNITED TECHNOLOGIES CORPORATION ) | |
| (d/b/a PRATT & WHITNEY), ) | |
| ) | |
| Defendant. ) | |
| ) | |

**UNITED TECHNOLOGIES CORPORATION'S MEMORANDUM IN OPPOSITION TO
ROLLS-ROYCE'S MOTION TO EXCLUDE SUPPLEMENTAL EXPERT REPORTS**

Defendant United Technologies Corporation ("UTC") respectfully submits this memorandum in opposition to Plaintiff Rolls-Royce Plc's ("Rolls-Royce") Motion to Exclude Supplemental Expert Reports (Dkt. 331).

For the reasons discussed below, UTC properly supplemented its expert reports pursuant to Fed. R. Civ. P. 26(e) and *Southern States*. Ignoring the clear precedent of the Fourth Circuit and this Court, Rolls-Royce misstates the standard for exclusion of expert reports in its Motion. UTC is permitted to supplement its expert reports under Fed. R. Civ. P. 26(e) until the parties' pretrial disclosures are due. Even if the Court were to find that UTC's supplemental expert reports were untimely, under the proper standard stated in *Southern States*, Rolls-Royce can allege neither prejudice nor incurable surprise as to UTC's supplemental expert reports of Dr. Alan Epstein and Dr. Scott Morris. Moreover, UTC's supplemental reports are both clearly justified and critical to its defense. Accordingly, UTC respectfully requests that Rolls-Royce's motion be denied.

**I.     Background**

    **A.     Dr. Epstein's Supplemental Report was Proper**

On December 27, 2010, UTC served the "Expert Report of Alan H. Epstein" ("Dr. Epstein's Initial Report"). (Pl.'s Mem., Ex. B, Dkt. 336-2). Dr. Epstein's initial report provided his opinion on anticipation, obviousness, and indefiniteness with respect to Roll-Royce's U.S. Patent No. 6,071,077 ("the '077 Patent"). Dr. Esptein's Initial Report focused on claims 1-5, 8-11 and 13. Dr. Epstein explained that with respect to anticipation and for obviousness for claims 6, 7, and 12 based on certain prior art that "at this time I do not have enough information to provide a sufficient opinion and will address this claim in a supplemental report." (Pl.'s Mem., Ex. B, at 44, 61, 77, 101-02, 106-07, 113, 121-22, 126-27, 133-34).

Prior to UTC serving Dr. Epstein's Initial Report, Rolls-Royce had never explained how infringement could ever be asserted with respect to claims 6, 7, and 12 of the '077 Patent. In fact, ten days before the December 27, 2010 deadline for expert reports, Rolls-Royce served a supplemental interrogatory response stating with respect to claims 6, 7, and 12:



(Ex. 1, portions of Attachment A to 12/17/2010 RR's 4th Supp. Interrogatory Responses at 19, 34.) Rolls-Royce made the same disclaimer for each engine discussed in its supplemental interrogatory response. On the same day that UTC served Dr. Epstein's Initial Report, Rolls-Royce served its Expert Report of Dr. Harri K. Kytömaa. (Ex. 2 (portions).) Through Dr.

Kytömaa's Report Rolls-Royce asserted infringement and explained for the very first time how infringement could ever be asserted with respect to claims 6, 7, and 12 of the '077 Patent. (*See* Ex. 2, at ¶¶ 180-83, ¶¶ 193-94.) Rolls-Royce subsequently supplemented its Response to Interrogatory No. 1 to reference Dr. Kytömaa's Report. (Ex. 3, 1/7/2011 RR's 5th Supp. Interrogatory Responses.)

After receiving Dr. Kytömaa's Report and Rolls-Royce's Fifth Supplemental Interrogatory Responses, UTC served the "Supplemental Expert Report of Alan H. Epstein, Ph.D." ("Dr. Epstein's Supplemental Report") on January 23, 2011. (Pl.'s Mem., Ex. C, Dkt. 336-3). Based on Dr. Kytömaa's interpretation of claims 6, 7, and 12, Dr. Epstein was finally able to provide opinions regarding obviousness and anticipation with respect to these claims via his Supplemental Report. (*See*, *id.* at e.g., 8-29, noting references to Dr. Kytömaa's report.)

Dr. Epstein's Supplemental Report also incorporates additional documents that further support his previously detailed opinions with respect to the PW305, PW306, PW308, and Fantrainer prior art. These additional documents support and do not change Dr. Epstein's earlier opinions.

### B.   Dr. Morris' Supplemental Report was Also Proper

UTC served its "Expert Report of Scott Morris, Ph.D." on December 27, 2010 ("Dr. Morris' Initial Report"). (Pl.'s Mem., Ex. D., Dkt. 336-4.) In his Initial Report, Dr. Morris opined on the invalidity of the '077 ████████████████████████████ ████████████████████████████████████████████████████ more than a year prior to the application date for the '077 Patent under 35 U.S.C. § 102(b). (Pl.'s Mem., Ex. D at 20-23.) As Dr. Morris noted, Rolls-Royce has admitted that ████████████████████

3

███ (*Id*. at 21.) Dr. Morris concluded that the ███ was ready for patenting on or before the October 9, 1997 critical date. (*Id.* at 23.)

After UTC served Dr. Morris' Initial report, UTC took the Rule 30(b)(6) deposition of Michael Adams, team leader of the Compressor Aerodynamics Group at Rolls-Royce, on January 4-5, 2011. Mr. Adams' deposition had originally been scheduled for December 21, 2010, prior to the December 27, 2010 deadline for the parties to submit their expert reports. However, on December 19, 2010, Rolls-Royce canceled the deposition because Mr. Adams could not reach the U.S. due to bad weather in London. The deposition was rescheduled for January 4, 2011, after the parties' expert reports were due. Mr. Adams deposition was key to understanding the ███ related to the development of swept fan technology.

On January 24, 2011, UTC served the "Supplemental Expert Report of Scott Morris, Ph. D." ("Dr. Morris' Supplemental Report"). (Pl.'s Mem., Ex. E, Dkt. 336-5.) Dr. Morris' Supplemental Report adds support to his prior opinion regarding the development and timing of patentability ███ Dr. Morris also identified the Rowlands three-region swept fan blade as ready for patenting before the critical date in his Supplemental Report. (*Id*. at 3-5.) Due to the timing of Mr. Adams rescheduled deposition, UTC had no choice but to supplement Dr. Morris' Initial Report. Indeed, Dr. Morris' Supplemental Report, particularly with respect to ███ relies on Mr. Adams' testimony and exhibits from Mr. Adams' deposition, the significance of which were only fully apparent to Dr. Morris after UTC had an opportunity to depose Mr. Adams. (*See id.*)

4

Similarly, although Rolls-Royce produced the CADDS drawings referenced in Dr. Morris' Supplemental Report as part of a collection of CDs on November 15, 2010, UTC and Dr. Morris had no basis for understanding the significance or relevance of the numerous files on these CDs until Rolls-Royce served Dr. Kytömaa's expert report on December 27th. It was when UTC received Dr. Kytömaa's report that it learned that these CDs may contain Fan Blade CAD Geometries for the Trent 8104. (Ex. B, ¶ 10 of Dr. Kytömaa Report, Ex. 2.) It took even longer for UTC to "crack the code" and determine that "▮▮▮▮▮" was Rolls-Royce speak for the Trent 8102/8104.

Additionally, Dr. Morris' Supplemental Report relies on documents that were not available to UTC and Dr. Morris until after the deadline to submit initial expert reports. On December 28 and 29, 2010, Roll-Royce produced documents constituting its tenth production. A keyword search conducted by UTC of Rolls-Royce's tenth production returned over 1000 documents related to Trent 8102 or 8104. (Ex. 4, 12/28/10 and 12/29/10 Rolls-Royce production letters.) Allowing time for those documents to be loaded and reviewed by UTC, Dr. Morris was then able to incorporate documents in his Supplemental Report from Roll-Royce's tenth production made after UTC served Dr. Morris' Initial Report. (*See* Pl.'s Mem., Ex. E.)

Dr. Morris' report further relies on documents from a third-party, Boeing, which UTC did not receive until January 12, 2011. (Ex. 5, 1/11/11 Boeing production letter.)[1] Dr. Morris' Supplemental Report relies on Boeing production documents TBC000001-TBC0000130 and TBC001056-TBC001061. Rolls-Royce tries to diminish the importance of the Boeing documents by arguing that Dr. Morris' Supplemental Report effectively only relied on eight pages of the

---

[1] While UTC subpoenaed Boeing for documents on December 1, 2010 (Ex. 6), Boeing only agreed to search for documents if production would be December 31 or later.

documents and that for six of the eight pages it had produced "similar" information. (*See* Pl.'s Mem. at 8, n.8.) In fact, Dr. Morris relies on all of the cited Boeing documents. (*See* Pl.'s Mem., Ex. E, at 3.)

Finally, as Rolls-Royce notes in its Memorandum in Support of its Motion, Dr. Morris' Supplemental Report "did not change [Dr. Morris'] existing opinions." (Pl.'s Mem, Dkt. 336, at 8.) In other words, this is not a case where an expert offered an entirely new opinion or reversed an earlier opinion. This contrasts with Rolls-Royce's expert, Mary Woodford, who supplemented her report with entirely new theories on the issue of royalties and damages. UTC has not filed any motions to strike the Woodford Supplemental Report. Rather, Dr. Morris' Supplemental Report provides further support for his existing opinion based largely on documents and information that was not available or effectively available to Dr. Morris until after his Initial Report was drafted and served. Once UTC became aware of/and or understood the significance of the additional documents and information, UTC provided them to Dr. Morris so that he could supplement his Initial Report.

### C.   Rolls-Royce was not Surprised Nor Has it Been Prejudiced by the Supplemental Morris and Epstein Reports

Rolls-Royce cannot credibly assert surprise or prejudice by the supplemental reports of Dr. Epstein and Dr. Morris, which were short—29 and 8 pages each—revisited opinions provided previously, and addressed, in part, facts that were not available at the time of their initial reports.

As noted above, the supplemental reports of Dr. Epstein and Dr. Morris do not change their opinions, relying substantially on additional and new evidence to support opinions that Rolls-Royce was already aware of. And to the extent they arguably assert "new" opinions the reasons for that were beyond their control—new analyses by Dr. Kytömaa regarding how to

6

apply claims 6, 7, and 12 and documents that either were actually or effectively unavailable at the time of their initial reports.

Regarding the timing of UTC's supplemental reports, they were served on January 23 and 24, nearly three weeks before the close of discovery and nearly four weeks prior to the final pretrial conference. The supplemental reports of Dr. Epstein and Dr. Morris were served three and two days, respectively, before Rolls-Royce's rebuttal report on validity was due. Further, following a meet and confer on the 24th, the parties mutually extended the deadlines for rebuttal briefs by two days to address UTC's concerns regarding the extent of Ms. Woodford's supplementations. (*See* Ex. 7, 1/24/11 Hill email summarizing extension agreement.) Thereby, Rolls-Royce was provided two additional days until January 28, sufficient time to address these short supplemental reports.

Moreover, Rolls-Royce has had over three weeks since service of these reports to prepare for the depositions of UTC's experts, which are scheduled for later this week. In short, despite its protestations, Rolls-Royce simply has not been prejudiced by UTC's supplemental reports in any way.

**II.     ARGUMENT**

    **A.     UTC's Supplementations Have not Violated Any Court Order and are Proper Under the Federal and Local Rules**

Absent a court order or local rule to the contrary, supplementation of expert reports is clearly contemplated and allowed by Fed. R. Civ. P. 26(e). Rule 26(e)(1) requires that a party "who has made a disclosure under Rule 26(a)" to "supplement...its disclosure…if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional corrective information has not otherwise been made know to the parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1). Rule 26(e)(2) applies the duty to

supplement from Rule 26(e)(1) to expert reports and notes that "[a]ny additions or changes to [the expert's report] must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). Moreover, the Local Rules of this Court provide that the completion of expert disclosure and discovery must be accomplished "not later than thirty (30) days after the date on which plaintiff is, or would be, required by Fed. R. Civ. P. 26(a)(2)(C) to disclose contradictory or rebuttal evidence." LR 26(D)(3).

To support its position that UTC's supplemental expert reports should be stricken, Rolls-Royce argues that UTC violated Local Rule 16 and the Scheduling Order (Dkt. #65) in this case. UTC disagrees. The Scheduling Order is silent as to supplemental expert reports. (*Id.* ¶ 12.) Moreover, the hearing from which Rolls-Royce quotes the Court in its Memorandum took place nearly two months after this Court issued its Scheduling Order in this case. (Pl.'s Mem. at 9, Ex. A.) UTC respectfully understood that the Court simply found that it would not issue a ruling regarding supplementation of expert reports in a vacuum, and that the Court cautioned against relying on insignificant evidence to justify a significant change to an expert's opinion. (Pl.'s Mem., Ex. A, 24-25.) The Court's comments from the December 10th hearing cited by Rolls-Royce are completely inapplicable here because UTC's experts have not *changed* their opinions. Rather, they have provided additional support for their earlier opinions.

Because there is no court order or local rule to the contrary, UTC's supplemental expert reports clearly fall within the bounds of Rule 26(e)(2), and are thus proper. UTC's supplemental expert reports are also timely because they were submitted prior to the February 17, 2011 deadline for the parties' pretrial disclosures, not later than 30 days after the date that plaintiff was required to disclose rebuttal expert evidence under LR 26(D)(3), and well before the close of discovery.

### B.      *Southern States* Sets Out the Fourth Circuit Test for Exclusion Under Rule 37(c)(1)

Even if the Court finds that UTC's supplemental expert reports were untimely, and thus in violation of Fed. R. Civ. P. 16 and Local Rule 16—which UTC maintains it should not— exclusion of UTC's expert reports is not automatic. The Court must determine whether the improper disclosure was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1); *see also S. States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2002); *Luma Corp. v. Stryker Corp.*, 226 F.R.D. 536, 543 (S.D. W.Va. 2005).

The Fourth Circuit considers five factors for determining whether an improper disclosure is substantially justified or harmless: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *S. States*, 318 F.3d at 597; s*ee also Rambus, Inc. v. Infineon Tech. AG*, 145 F. Supp. 2d 721, 726 (E.D. Va. 2001) (applying similar factors as those later adopted by the Fourth Circuit in *Southern States*). The test is the same whether the Court considers exclusion under Rule 16(f) or 37(c)(1). *See Luma Corp.*, 226 F.R.D. at 544.

Courts seem most inclined to exclude some or all of an expert's testimony when the disclosure of the expert's opinion occurs during or on the eve of trial, an issue not applicable to UTC's expert supplementation. In *Southern States* the Fourth Circuit upheld the exclusion of an expert's testimony based on a new opinion first disclosed at trial. 318 F.3d at 594. Similarly in *Rambus v. Infineon*, this Court excluded the plaintiff's expert from testifying as to most (but not all) of his opinions offered in a second supplemental expert report submitted after the close of

both fact and expert discovery in the case, after the claim construction hearing, and only a week before the trial was scheduled to begin. 145 F. Supp. 2d at 730-36.

It appears that this Court has issued no written opinion applying the *Southern States* factors to expert supplementation that occurs during the discovery period. However, *Luma Corp. v. Stryker Corp.*, is instructive on this point. 226 F.R.D. 536 (S.D. W.Va. 2005). In *Luma*, the plaintiff argued that the defendant's supplemental expert reports were improper under Fed. R. Civ. P. 26(e)(1) because the information on which the experts relied in the supplemental reports was available at the time the experts served their initial reports. *Id.* at 539. Applying the five-factor test from *Southern States*, the Court found that the plaintiff suffered no prejudice or surprise from the defendant's supplemental expert reports because the reports were served prior to the experts' depositions and because the plaintiff retained the opportunity to supplement its own expert reports. *Id.* at 544-45. The court also noted that trial of the case would not be disrupted. *Id.* at 545. Thus, the court denied the plaintiff's motions to strike the defendants supplemental expert reports.

C.  **Rolls-Royce Ignored the Relevant Legal Standard from *Southern States***

Rather than relying on the relevant standard set forth in *Southern States* and *Rambus*, Rolls-Royce relies primarily on its own inferences about the Court's December 10, 2010 hearing, as noted above. *Rolls-Royce* also relies on two written decisions, neither of which are applicable here. (Pl.'s Mem. at 9-11). The *Trilogy Communications* case addressed an expert report that "contained new opinions not found in the original report." *Trilogy Commc'ns v. Times Fiber*

*Commc'ns, Inc.*, 109 F.3d 739, 744 (Fed. Cir. 1997).[2] Here, neither of UTC's experts changed their opinions in their supplemental reports. Rather, their supplemental reports further supported their earlier opinions.  Any "new" opinions were based on information and documents that were not available or not effectively available until after the December 27th deadline for initial reports.

*Rolls-Royce* relies on *Akeva LLC v. Mizuno Corporation,* 212 F.R.D. 306 (M.D.N.C.) to argue that the same factors applied by the Federal Circuit in *Trilogy* apply in the Fourth Circuit. However, *Akeva* was a decision from the Middle District of North Carolina decided before *Southern States.* As noted above, the proper test to apply here is the one set forth in *Southern States*.

Rolls-Royce relied on *Southern States* in its Memorandum in Support of its Motion to Strike UTC's First and Second Supplemental Disclosures (Dkt. 358 at 3), which it filed on the same day as the instant motion to exclude, yet *Rolls-Royce* conspicuously failed to cite the controlling *Southern States* decision in this motion. Rolls-Royce apparently avoided relying on *Southern States* in its motion to exclude because Rolls-Royce knew that it could not meet the *Southern States* standard for exclusion.

### D. Applying the Five-Factor Test from *Southern States*, UTC's Supplementation of its Expert Reports Should be Permitted

Applying the Fourth Circuit Five-Factor test, it is apparent that UTC's supplemental expert reports should be permitted. Under Factor 1, there has been no surprise to Rolls-Royce.

---

[2] The *Trilogy*  case was also an appeal from the Southern District of Mississippi. The Fifth Circuit test for exclusion differs from the Fourth Circuit Test. The Federal Circuit "applies the law of the applicable regional circuit" when "reviewing the application of the Federal Rules." *Trilogy Commc'ns v. Times Fiber Commc'ns, Inc.*, 109 F.3d at 744. Thus, clearly, *Southern States*, and not *Trilogy*, should guide the Court's decision here.

Rolls-Royce was on notice of UTC's experts' opinions since they served their initial reports in late December. UTC's supplemental expert reports add further support to these opinions, but do not change Dr. Morris' and Dr. Epstein's overall opinions. Moreover, UTC questions how Rolls-Royce could claim surprise or prejudice based on UTC's supplemental reports and at the same time serve and rely on its own supplemental report of its expert Mary Woodford on January 21, 2011, two and three days before UTC served its supplemental reports. Clearly if UTC is not prejudiced by Rolls-Royce's supplemental expert report, Rolls-Royce is similarly not prejudiced.

Under Factor 2, any alleged surprise to Rolls-Royce can be easily cured. Roll-Royce had ample time to address UTC's supplemental expert reports in Rolls-Royce's rebuttal expert report by Dr. Kytömaa (dated January 28), and Rolls-Royce will have an opportunity to question UTC's experts on the information in their supplemental reports during their depositions.

Under Factor 3, there will be no disruption to the trial schedule. Discovery has not closed in this case and any follow-up to UTC's supplemental expert reports by Rolls-Royce can or could have taken place during the discovery period.

Under Factor 4, Dr. Epstein's and Dr. Morris' supplemental reports add important support to UTC's obviousness and on-sale bar defenses. For example, Dr. Morris' supplemental report adds key documents from Rolls-Royce (e.g., CADDS drawings) to establish ████████. Additionally, Dr. Epstein's report allows UTC to finally address claims 6, 7, and 12 from the '077 Patent for the first time in a meaningful way. If the Court were to strike Dr. Epstein and Dr. Morris' supplemental reports, UTC would be unfairly hindered in its ability to present its defenses at trial due to factors outside of UTC's and its experts' control.

Finally, under Factor 5, as discuss above, in their supplemental reports, Dr. Epstein and Dr. Morris relied largely on information and documents that were not available or not effectively available until after the December 27th deadline for initial reports. Additionally, Dr. Epstein relied on Roll-Royce's allegations of infringement related to claims 6, 7, and 12 that Rolls-Royce articulated for the first time in its own expert report served the same day as Dr. Epstein's Initial Report.

Accordingly, it is clear that UTC's supplementation of Dr. Epstein and Dr. Morris' reports was both "harmless" and "justified." Consistent with the decision in *Luna*, the Court should find that exclusion of UTC's supplemental expert reports is not warranted under either Rule 16(f) or Rule 37(c)(1).

## III. CONCLUSION

For the foregoing reasons, Rolls-Royce's motion to exclude should be denied. UTC properly supplemented its expert reports, and thus should be permitted to rely on them at trial.

Dated: February 9, 2011                    Respectfully submitted,

*Of Counsel*:

Philip S. Beck
Jason L. Peltz
Chris Lind
Michael J. Valaik
Hamilton H. Hill
Paul J. Skiermont
Andrew C. MacNally
BARTLIT BECK HERMAN
    PALENCHAR & SCOTT LLP
54 West Hubbard St.
Suite 300
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440

/s/ C. Brandon Rash
Donald R. Dunner (DCB #38273)
don.dunner@finnegan.com
Allen M. Sokal (DCB #188045)
allen.sokal@finnegan.com
Don O. Burley (DCB #439163)
don.burley@finnegan.com
Gerald F. Ivey (DCB #367009)
gerald.ivey@finnegan.com
M. Andrew Holtman (DCB #478923)
andy.holtman@finnegan.com
C. Brandon Rash (VSB #72248)
brandon.rash@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Phone: (202) 408-4000
Fax: (202) 408-4400

Robert L. Burns (VSB #65159)
robert.burns@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
Phone: (571) 203-2700
Fax: (202) 408-4400
**Counsel for Defendant**
**United Technologies Corporation**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of February, 2011, I will electronically file the foregoing **United Technologies Corporation's Memorandum In Opposition To Rolls-Royce's Motion To Exclude Supplemental Expert Reports** with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing (NEF) to the following:

Scott G. Lindvall
KAYE SCHOLER LLP
425 Park Ave.
New York, NY 10022
Telephone: (212) 836-8700
Facsimile: (212) 836-6369
slindvall@kayescholer.com

William P. Berridge
Richard E. Rice
Aaron Levi Webb
OLIFF & BERRIDGE, PLC
277 South Washington Street
Alexandria, VA 22314
Telephone: (703) 836-6400
Facsimile: (703) 836-2787
wberridge@oliff.com
rrice@oliff.com
awebb@oliff.com

Counsel for Plaintiff
Rolls-Royce plc

R. William Sigler
KAYE SCHOLER LLP
901 15th St., NW
Suite 100
Washington, DC 20005
Telephone: (202) 682-3500
Facsimile: (202) 682-3580
bsigler@kayescholer.com

/s/ C. Brandon Rash
C. Brandon Rash (VSB #72248)
brandon.rash@finnegan.com
Finnegan, Henderson, Farabow,
    Garrett & Dunner, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Phone: (202) 408-4000
Fax: (202) 408-4400