IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| ROLLS-ROYCE plc, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
|     v. | )   Civil Action No. 1:10-cv-457-LMB-JFA |
| | ) |
| UNITED TECHNOLOGIES | )   DEMAND FOR JURY TRIAL |
| CORPORATION (d/b/a PRATT & | ) |
| WHITNEY), | ) |
| | ) |
|         Defendant. | ) |

**UTC' BRIEF IN SUPPORT OF ITS MOTION IN LIMINE #2
TO PRECLUDE ROLLS-ROYCE FROM PRESENTING EVIDENCE
OR ARGUMENT AT TRIAL OF UNSUPPORTED
<u>LUMP SUM REASONABLE ROYALTY DAMAGES</u>**

In its first motion in limine, UTC addressed some of the major flaws in Rolls-Royce's $3.7 billion lost profits and price erosion claims. (Dkt. 508, UTC MIL #1) As noted in that motion, UTC planned to address at a later date the numerous flaws in Rolls-Royce's equally ambitious alternative reasonable royalty damages claim. (*Id*. at 2 n.1, 10 n.9) Given that the Court plans to address issues relating to Rolls-Royce's damages claims at the March 17 hearing, efficiency dictates that UTC raise some of the reasonable royalty damages issues now so that the Court has the opportunity to address them simultaneously on March 17 if the Court so chooses.

UTC asks the Court to limit Rolls-Royce at trial to offering its $493 million royalty calculation (less those damages barred by 35 U.S.C. § 286), and to prevent Rolls-Royce from offering its "alternative" $1.3 billion royalty calculation because it improperly includes $800 million that is akin to prejudgment interest, which is the province of the Court and not the jury.

**Background**

As an alternative to its lost profits and price erosion claims, Rolls-Royce puts forth a "reasonable royalty" damages theory. Specifically, Rolls-Royce's expert, Mary Woodford, opines that in late 2000—before having made or sold a single engine—UTC would have agreed to pay Rolls-Royce an upfront lump-sum royalty of $493 million in order to use the fan blade profile of the '077 patent.[1] (Ex. 1, Woodford Report ¶¶ 135, 208-09; Ex. 2, Woodford Dep. at 165-66) She assumes that rather than UTC insisting on a running royalty on UTC's actual future sales (i.e., pay-as-you-go—the more common way that royalties are calculated), UTC would have agreed to an upfront lump-sum royalty based on hoped-for future sales.[2]

Ms. Woodford acknowledges but ignores the fact that UTC was "unwilling . . . to invest the approximately $1 billion expected to be required to develop" the GP7200 engine in the first place, and as a result formed a joint venture with GE to split those development costs 50/50. (Ex. 1, Woodford Report ¶ 36; Ex. 3, Jones Dep. at 49) Yet despite her acknowledgment that UTC was not willing to invest $1 billion, Ms. Woodford's royalty calculation inexplicably assumes it would have done just that.[3] As an initial matter, therefore, her royalty opinion

---

[1] This is Ms. Woodford's second reasonable royalty theory. In her original report in December 2010, she based her reasonable royalty in part on the "25% rule," which the Federal Circuit subsequently rejected in January 2011. *Uniloc USA, Inc. v. Microsoft Corp.*, Nos. 2010-1035, 2010-1055, 2011 WL 9738, at *22 (Fed. Cir. Jan. 4, 2011). Ms. Woodford offered her current royalty theory in her second report on January 21, 2011.

[2] It would have been more reasonable for Rolls-Royce to apply a running royalty rate here on UTC's actual future engine sales rather than to ask for a lump sum payment in 2000 based on projections of fuel burn savings stretching out more than 30 years, well beyond the patent's life.

[3] UTC's share of the GP7200 development costs ($500 million) plus Ms. Woodford's projected $493 million license would have amounted to about $1 billion.

directly contradicts itself and undermines the basic assumption on which she bases her calculation, and defies common sense.[4]

Putting that fundamental inconsistency aside, there are additional flaws in Rolls-Royce's royalty theory. Ms. Woodford's theory is based on predictions and assumptions regarding fuel burn savings she assumes UTC's customers will achieve from UTC's alleged use of the patented fan blade design. (Ex. 1, Woodford Report ¶¶ 208-09) She first predicts the fuel burn savings over the life of 128 airplanes with GP7200 engines—the 19 airplanes that exist now and another 109 airplanes she assumes will exist in the future—from the alleged use of the patented fan blade design. (*Id*. at ¶ 207[5]) She then calculates the entire amount of the purported fuel burn benefit she assumes UTC's customers would have enjoyed over a 38 year period, and determines the value of that alleged fuel burn savings as of the hypothetical negotiation in 2000 ($493 million). (*Id*. at ¶¶ 207-09; Ex. 2, Woodford Dep. at 165-66) She claims, therefore, that UTC would have paid Rolls-Royce a lump sum royalty of $493 million in 2000. (Ex. 2, Woodford Dep. at 167) Although it is flawed, UTC does not challenge that portion of Ms. Woodford's analysis here.

Ms. Woodford, however, goes further. She then nearly triples her "reasonable royalty" number by stating it in "2010 dollars," which amounts to a $1.3 billion proposed royalty. (Ex. 1, Woodford Report ¶¶ 207-09) Ms. Woodford provided no basis for performing this calculation. And she was unable to explain it in her deposition, other than calling it a "different point of departure." (Ex. 2, Woodford Dep. at 167-169) To the extent Ms. Woodford's attempt to triple her royalty amount was intended to compensate Rolls-Royce for the lost time-value of money

---

[4] UTC does not ask the Court at this time to exclude Ms. Woodford's entire $493 million royalty claim based on this fundamental flaw.

[5] Exhibit 1 contains one redaction in ¶ 207. UTC has not filed an unredacted copy of ¶ 207 because the redacted content is not necessary for this analysis. For the Court's reference, an unredacted version of ¶ 207 has already been filed under seal as Exhibit C to UTC's MIL #1. (Dkt. 508, MIL #1 at Ex. C)

from the date the royalty would have been paid in her hypothetical world (late 2000) until now, such prejudgment interest is a legal issue for the Court.  Rolls-Royce should not be permitted to usurp the Court's function and present its $1.3 billion number to the jury.

## Argument

**I.     Rolls-Royce Impermissibly Inflates Its Royalties Calculation to 2010 Dollars**

Rolls-Royce has failed to identify any permissible purpose for offering its $1.3 billion "alternative calculation."  It also has failed to tie the $1.3 billion to the "facts" of Ms. Woodford's hypothetical negotiation.  The $1.3 billion calculation should be excluded because it serves no purpose other than to mislead and taint the jury by artificially inflating Rolls-Royce's reasonable royalty claim by over $800 million.

A lump sum reasonable royalty calculation must determine the amount the parties would have agreed to during a hypothetical negotiation at the time of first infringement.  *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("[T]he jury decided on a lump-sum payment . . . [and] we must decide whether substantial evidence supports the jury's implicit finding that [defendant] would have agreed to, at the time of the hypothetical negotiation, a lump-sum, paid-in-full royalty [payment].").  The patent holder may then be entitled to pre-judgment interest from the date of the lump sum royalty payment in the "but-for" world until trial.  *See, e.g.*, *DataTreasury Corp. v. Wells Fargo & Co.*, No. 2:06-CV-72 DF, 2010 WL 5140718, at *6 (E.D. Tex. Sept. 27, 2010) (finding that prejudgment interest on lump sum runs from time of hypothetical negotiation).

Ms. Woodford admits that her $1.3 billion royalty calculation does not reflect the results of her proposed hypothetical negotiation.  She assumes that the hypothetical negotiation would occur "in late 2000," not a decade later in 2010. (Ex. 1, Woodford Report ¶ 135)  Furthermore,

she admits that based on her view of the hypothetical negotiation, UTC would have paid a $493 million lump sum royalty in 2000, not $1.3 billion in 2010:

> Q. Under your hypothetical negotiation, UTC pays a lump sum royalty in late 2000, true?
>
> A. Yes.
>
> Q. That amount in 2000 dollars would have been $493 million, true?
>
> A. Yes.

(Ex. 2, Woodford Dep. at 167)

Ms. Woodford also claims that her $1.3 billion royalty calculation is not meant to represent prejudgment interest. (*Id*. at 166-69)  In fact, she admits that applying a typical prejudgment interest rate to the proposed $493 million lump sum royalty would result in a total payment that is <u>less</u> than $1.3 billion:

> "I think – I can't presume to speak for the Court, but I think if you actually apply prejudgment interest to the $493 million amount, my understanding, given the range generally of what prejudgment interest rates may be, that the $493 [million] expressed in 2010 dollars would be less than $1.3 billion."

(*Id*. at 168)  But even if her alternative $1.3 billion calculation reflects Rolls-Royce's view of prejudgment interest, Rolls-Royce should not be allowed to present that number to the jury.  The application and calculation of prejudgment interest is left to the Court, not the jury.[6]  *See NTP Inc. v. Research In Motion, Ltd.*, 270 F. Supp. 2d 751, 762 (E.D. Va. 2003) ("[T]he

---

[6] Ms. Woodford's $1.3 billion alternative calculation would translate into an exorbitant 11% prejudgment interest rate, compounded annually. (*See* Ex. 2, Woodford Dep. at 168-69) Although the Court has discretion, courts often apply interest rates such as the U.S. Treasury bill rate or the "prime rate" charged by banks as the basis for prejudgment interest. *See Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (affirming the application of the U.S. Treasury bill rate); *NTP*, 270 F. Supp. 2d at 763 (applying the prime rate). By way of example, the current U.S. Treasury bill rate is .13% for three month bills and the prime rate is 3.25%.

determination of whether [prejudgment] interest is warranted, and the rate of interest, is within the ambit of the court's discretion."); 35 U.S.C. § 284 (requiring interest be "fixed by the court").

Ms. Woodford's only explanation for her alternative calculation is that it provides "a different point of departure" for her royalty analysis. (Ex. 2, Woodford Dep. at 169) But she does not explain how her "different point of departure" relates to the facts of her hypothetical negotiation, and she admits that her alternative calculation does not reflect the results of that negotiation. Rolls-Royce has not—and cannot—explain why this alternative calculation is relevant. The only purpose for Rolls-Royce's $1.3 billion royalty number is to mislead the jury and improperly inflate Rolls-Royce's damages calculation. *See generally Uniloc USA, Inc. v. Microsoft Corp.*, Nos. 2010-1035, 2010-1055, 2011 WL 9738, at *22 (Fed. Cir. Jan. 4, 2011). Therefore Rolls-Royce should be limited to offering its $493 million royalty calculation at trial (less those damages barred by 35 U.S.C. § 286).

## II. Rolls-Royce's Alternative Royalties Calculation Includes Damages Expressly Barred by Section 286 of the Patent Act

Finally, like its lost profits and price erosion theories, Rolls-Royce's alternative royalty damages calculation includes damages expressly barred by 35 U.S.C. § 286. (*See generally*, Dkt. 508, UTC MIL #1 at 3-10 & n.9) Rolls-Royce seeks royalties on the same non-existent engines stemming from the same allegedly infringing offers to sell that occurred prior to the statutory damages period (*i.e.*, prior to May 5, 2004). For instance, Rolls-Royce claims royalty damages for non-existent engines based on Air France's selection of the GP7200 to power its A380 airplanes in July 2001. (Ex. 1, Woodford Report ¶ 135) For the same reasons that Rolls-Royce cannot recover lost-profits damage for infringing acts that occurred prior to May 5, 2004, it cannot recover royalty damages for such infringement either. Section 286 applies equally to Rolls-Royce's royalty claim; it makes no distinction between royalty and lost profits damages.

**Conclusion**

For the foregoing reasons, Rolls-Royce should be limited to offering its $493 million royalty calculation at trial (less those damages barred by 35 U.S.C. § 286) and therefore Rolls-Royce should be barred from presenting its $1.3 billion "alternative" royalty calculation to the jury because it improperly includes over $800 million that is akin to prejudgment interest.

March 8, 2011                                                          Respectfully submitted,

|  |  |
|---|---|
| *Of Counsel*: | /s/ C. Brandon Rash |
|  | Donald R. Dunner (DCB #38273) |
|  | don.dunner@finnegan.com |
| Philip S. Beck | Allen M. Sokal (DCB #188045) |
| Jason L. Peltz | allen.sokal@finnegan.com |
| Chris Lind | Don O. Burley (DCB #439163) |
| Michael J. Valaik | don.burley@finnegan.com |
| Hamilton H. Hill | Gerald F. Ivey (DCB #367009) |
| Paul J. Skiermont | gerald.ivey@finnegan.com |
| Andrew C. MacNally | M. Andrew Holtman (DCB #478923) |
| BARTLIT BECK HERMAN | andy.holtman@finnegan.com |
|     PALENCHAR & SCOTT LLP | C. Brandon Rash (VSB #72248) |
| 54 West Hubbard St. | brandon.rash@finnegan.com |
| Suite 300 | FINNEGAN, HENDERSON, FARABOW, |
| Chicago, IL 60654 |     GARRETT & DUNNER, LLP |
| Phone: (312) 494-4400 | 901 New York Avenue, N.W. |
| Fax: (312) 494-4440 | Washington, D.C. 20001-4413 |
|  | Phone: (202) 408-4000 |
|  | Fax: (202) 408-4400 |
|  |  |
|  | Robert L. Burns (VSB #65159) |
|  | robert.burns@finnegan.com |
|  | FINNEGAN, HENDERSON, FARABOW, |
|  |     GARRETT & DUNNER, LLP |
|  | Two Freedom Square |
|  | 11955 Freedom Drive |
|  | Reston, VA 20190 |
|  | Phone: (571) 203-2700 |
|  | Fax: (202) 408-4400 |
|  | **Counsel for Defendant** |
|  | **United Technologies Corporation** |

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of March 2011, I will electronically file the foregoing **United Technologies Corporation's Brief in Support of its Motion in Limine #2 to Preclude Rolls-Royce From Presenting Evidence Or Argument At Trial of Unsupported Lump Sum Reasonable Royalty Damages** with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing (NEF) to the following:

Scott G. Lindvall
Kaye Scholer LLP
425 Park Ave.
New York, NY 10022
Telephone: 212-836-8700
Facsimile: 212-836-6369
slindvall@kayescholer.com

William P. Berridge
Richard E. Rice
Aaron Levi Webb
Oliff & Berridge, PLC
277 South Washington Street
Alexandria, VA 22314
Telephone: 703-836-6400
Facsimile: 703-836-2787
awebb@oliff.com
rrice@oliff.com
wberridge@oliff.com

Counsel for Plaintiff
Rolls-Royce plc

/s/ C. Brandon Rash
C. Brandon Rash (VSB #72248)
brandon.rash@finnegan.com
Finnegan, Henderson, Farabow,
  Garrett & Dunner, LLP
901 New York Ave., NW
Washington, DC 20001
Phone: (202) 408-4000
Fax: (202) 408-4400

Counsel for Defendant
United Technologies Corporation